# EXHIBIT "B"

5/28/2021 3:54 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 53937298
By: Patricia Jones
Filed: 5/28/2021 3:54 PM

CAUSE NO. _____

| | | |
|---|---|---|
| ALEXIOS VARDOULAKIS, | § | IN THE DISTRICT COURT |
| INDIVIDUALLY AND ON BEHALF | § | |
| OF CARIBE TANKERS, LTD., | § | |
| | § | |
| Plaintiff, | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| v. | § | |
| | § | |
| EDUARDO NERI, | § | |
| | § | |
| Defendant. | § | _____ JUDICIAL DISTRICT |

### PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF

TO THE HONORABLE COURT:

COMES NOW, Plaintiff, ALEXIOS VARDOULAKIS, INDIVIDUALLY AND ON BEHALF OF CARIBE TANKERS, LTD.,  and files this his Original Petition and Application Temporary Restraining Order and Injunctive Relief, complaining of EDUARDO NERI, Defendant herein, and for cause of action would show the Court the following:

## I.
## DISCOVERY PLAN

Discovery in this case shall be conducted pursuant to Discovery Level 2.

## II.
## VENUE

Venue is proper in Harris County, Texas, pursuant to the venue provisions set forth in Section 11 of the Parties' First Amended Buy-Sell Agreement.

## III.
## PARTIES

The Plaintiff, ALEXIOS VARDOULAKIS, individually and on behalf of Caribe Tankers, Ltd., is an individual residing and doing business in Houston, Texas.

1

Defendant, EDUARDO NERI, is an individual residing in Mexico, but doing business in Houston, Texas.  Mr. Neri may be  served with process, by certified mail, return receipt requested at CARIBE TANKERS DE MEXICO, SA DE CV, BLV. MIGUEL ALEMAN 82 OF 23, BOCA DEL RIO, VERACRUZ CP 94290.

## IV.
## SUPPORTING EVIDENCE

This Original Petition and Application for Temporary Restraining Order and Injunctive Relief is supported by the Affidavit of Alexios Vardoulakis, a true and correct copy of which is attached hereto as **Exhibit 1**, and incorporated herein for all purposes.

| | | |
|---|---|---|
| **Exhibit 1** | - | Affidavit of Alexios Vardoulakis; |
| **Exhibit A** | - | Buy-Sell Agreement; |
| **Exhibit B** | - | Subscription Agreement, along with its accompanying Promissory Note; |
| **Exhibit C** | - | March 22, 2021 email and memorandum from Alexios Vardouakis to Eduardo Neri; |
| **Exhibit D** | - | March 22, 2021 email in response from Eduardo Neri to Alexios Vardoulakis; |
| **Exhibit E** | - | May 3, 2021 email from Alexios Vardoulakis to Eduardo Neri; and |
| **Exhibit F** | - | May 4, 2021 email in response from Eduardo Neri to Alexios Vardoulakis. |

## V.
## FACTS

On or about June 12, 2009, Caribe Tankers, LTD, a corporation, was established in the Marshall Islands, ("CTL" or the "Company"), in which Plaintiff, Alexios Vardoulakis, ("Vardoulakis"), owned twenty (20) shares, Defendant, Eduardo Neri, ("Neri"), owned sixty (60)

shares, and Spiridon Konstantinos Papanikolaou owned  twenty (20) shares, of the 100 shares that the Company issued.   On August 18, 2009, the three Shareholders, who also constituted the Board of Directors for the Company, executed the By-Laws of CTL and began operating contemporaneous therewith as a time charter entity.[1]  CTL is arguably still in good standing and validly existing and, to this day, operates as a Marshall Island corporation.   To fully appreciate the situation, the recitation of a detailed set of facts is necessary.

On January 1, 2010, CTL entered into a Commercial Management Agreement ("CMA"), with an entity called Caribe Tankers, Inc., ("CTI"), in which the Company engaged CTI, as set forth in the CMA, *"...to act as its agent/manager to provide commercial management services as set forth below and Caribe Tankers, Inc., agrees to accept said engagement"*.   On or about June 4, 2012, CTI and CTL entered into Amendment I to the CMA, ("CMA I") which, ostensibly, was a reprise of the CMA but with a new expiration date.   Contemporaneously, and perhaps the basis for the CMA I, Mr. Papanikolaou's share were re-acquired by the Company, thus leaving Vardoulakis with 25 percent of the Company and Neri with 75 percent.   Thereafter, on or about April 25, 2014, Vardoulakis acquired 4 additional shares from Neri, leaving the parties with 24 shares (Vardoulakis), and 56 shares (Neri), and 30 and 70 percent ownership in the Company, respectively, as of that date.   On April 25, 2014, the parties entered  into a Buy-Sell Agreement,

---

[1]   Time chartering cargo vessels is like renting a fully furnished and stocked apartment.   A time charterer pays the owner of the vessel a daily fee for the use of a fully crewed and operating vessel.  The time charterer is responsible to pay for the fuel, port costs, and undertake charter liability insurance.  The time charterer's only other responsibility is to find customers with cargo to transport.  A time charterer's daily fee,  insurance, and fuel costs accrue and is due whether the vessel is sitting idle in port or transporting goods on the seas.

("Buy-Sell"), which is attached hereto as **Exhibit A**.[2]   Unlike a standard buy sell agreement dealing with issues of death, divorce, termination of employment, *etc.*, this one included a procedure for the purchase and sale of each of the shareholders' percentage to the other if and when a deadlock existed between them on fundamental matters, as listed in the Buy-Sell.  In or about late 2015 and early 2016, the parties decided to move from exclusively the time charter business to lease to the potential ownership of 3 cargo vessels. This was a decided shift in the Company's business model.[3]   Contemporaneously, the parties entered into a Subscription Agreement on or about January 1, 2016, a part of which included the equalization of ownership in the Company, accompanied by a $600,000.00 Promissory Note payable to Neri, to accomplish the same.  The Subscription Agreement, along with its accompanying Promissory Note, are attached hereto as **Exhibit B**.   Neri recently, (April 12, 2021), made demand for the payment of the $600,000.00. In response to the demand, Vardoulakis timely tendered $600,000.00 in return for the transfer of the 16 shares to equalize the parties' ownership in the Company.  It should be noted that despite the Subscription Agreement's entry in 2016 and Vardoulakis' execution of the Promissory Note, Neri never tendered the 16 shares in accordance with the Subscription Agreement. Moreover, even after Neri's demand for the $600,000.00 and Vardoulakis' tender of

---

[2] Although titled as "First Amended Buy Sell Agreement", Exhibit A is the only buy sell agreement entered into by the parties.

[3] As opposed to a time charter, in this model, CTL rented the bare boat (the steel only) for a daily fee, *e.g.*, $3,450.00 a day, and was responsible for everything else.  The theory and goal was that CTL could operate the vessel for less than the time charter vessel owner's daily fee, and there was a purchase mechanism 5 years later, which incorporated a several million dollar deposit, that depending on the circumstances, was applied to the purchase purpose or diminished in part or could be lost in whole.

the same, Neri failed and refused to transfer the 16 shares of stock of the Company, again, in violation of the Subscription Agreement.

On March 23, 2016, CTL and CTI entered into a second amended CMA, (the CMA II), the term of which was 12 months, automatically renewing for successive 12 month periods unless terminated by the parties, in accordance therewith.[4]

The Company proceeded to enter into lease to own contracts for 3 cargo ships in 2016 and in 2017 added an additional 2 vessels to the fleet, and began operating in such fashion.[5]  In May 2019, Vardoulakis obtained a financial analysis, which predicted a financial crisis should the Company continue as it was.  In furtherance of such impending financial troubles, the Company, through the efforts of Vardoulakis, began looking to refinance CTL's debt in or about April of 2020.   There was no consensus between the parties on that approach as Neri dismissed the efforts as pre-mature.  Further, the financial models of the Company's revenue stream indicated that the Company would not have the funds to pay for the mandated and scheduled dry docking of one of the Company's cargo ships, the *Caribe Liza.*[6]    Likewise, there was no consensus between the parties on the matter, as Neri again dismissed Vardoulakis' concerns as the scheduled dry docking was still 6 months away.   The impending financial crisis came to a head in February 2021 when

---

[4]  The title of the CMAII is different as well as its content, which reflect CTI's additional responsibilities and duties therein, as direct result of the change in the business model of CTL.

[5]  In 2016 CTL leased 3 vessels, adding another 2 in 2017, adding another and then selling one in 2019, selling one in 2020, selling another and adding one time charter vessel in 2021, leaving CTL with 2 vessels from 2016, 1 from 2019, and the time charter vessel, at present.

[6]  The same held true for the *Caribe Cristina*, and the *Caribe Maria* 6 months later. The cost of each dry docking per vessel is approximately 1.2 million dollars.  Vardoulakis' refinancing effort was also made, in part, to pay for these required dry dockings.

the parties spoke by *zoom,* during which conference Vardoulakis again raised the alarm on the Company's financial issues, expressly outlining the impending doom and the dominoes that would soon fall if something was not done, which presentation was accompanied with supporting materials.[7]    For at least the third time, Neri dismissed the alarms and data and deferred the matter.  It was now clear a deadlock existed between the parties regarding the direction and operation of CTL. What ensued, thereafter,  was a series of emails between the parties which further evidenced the divide.   On March 22, 2021, Vardoulakis forwarded a memorandum regarding CTL's financial condition.   A copy of Vardoulakis' email with memorandum is attached hereto as **Exhibit C.   Neri's response, that same day, was to unilaterally terminate the CMA II, and, ostensibly, CTI.  It should be noted that CTI had been CTL's agent, sole operational and commercial and technical management arm since CTL's inception, to include possessing all of its institutional knowledge, experience and expertise.**  Although a Deadlock, as that term is defined in the Buy-Sell, is surely to have occurred prior to March 22, 2021, Neri's actions of that date clearly evidence a Deadlock on at least one or more of the Fundamental Matters, as listed in the Buy-Sell, and arguably, at the same time,  the repudiation and breach of the Buy-Sell's requirement for good faith negotiations for 30 days, assuming the Deadlock had not begun earlier, *e.g.*, on February 8, 2021.[8]  Notwithstanding the fact that Neri had no authority to terminate the CMA II as an individual, he also had no authority to terminate

_____

[7]   There were at least two other people in attendance at the February 8, 2021 conference.

[8]  On top of the obvious termination of CTI, the actions of Neri evidenced going from a corporation that was run by both shareholders, and a board of directors, to a sole proprietorship where Neri simply did what he wanted, to include but not limited to operating the Company as his own personal tool, failing to comply with corporate formalities, and creating a sham entity.

the CMA II as a shareholder, as such action was an act that was within the exclusive province of CTL's Board of Directors.[9]  A copy of Neri's March 22, email in response is attached hereto as **Exhibit D**.  Further, no where did Neri explain how he was to going to replace the work that CTI performed for CTL, at what cost, or savings, nor how he intended to bridge the tremendous gap in institutional knowledge, experience and expertise of CTI, as he had historically left all such work and oversight to CTI and Vardoulakis.  Of course, Neri's announcement was also in the face of Vardoulakis' previously conducted analysis of the savings, if any, that could be had with the replacement of CTI.  The analysis indicated that the crisis was not solely or materially brought on by any excessive cost elements, to include CTI's management fees. To the contrary, the crisis was brought on by CTL's critical failure to maximize revenues, which was exacerbated by CTL's myopic reliance on one large client, which was not so ironically one that was cultivated by Neri.[10]  It is also not ironic that Neri took action, *albeit* without authority, only when Vardoulakis took aim at the revenue side, which expressly targeted Neri's harvested client.  In furtherance of full disclosure, by email dated March 23, 2021, Neri responded, after feigning ignorance of Vardoulakis' previous proffered solutions, *e.g.*, the proffer of which had begun well before, but certainly by February 8, 2021.  In any event, Vardoulakis had expressly made Neri aware of his intended solutions, on several occasions, which included, at a minimum, approaching CTL's largest client about maximizing cargo on its ships and thus CTL's revenue. Neri, of course, myopically, again solely focused on CTL's expenses, which analysis Vardoulakis had already

---

[9]  Of this fact, CTL's acting corporate counsel advised the parties in writing.

[10]   In Vardoulakis' email of March 22, 2021, **Exhibit C** hereto, he expressly suggested solutions to the crisis, which included approaching CTL's largest client about CTL's need to maximize the hauling of cargo on CTL runs involving that client and tightening that client's payment terms.  Neri objected to the same.

performed and passed along to Neri.  By email dated March 24, 2021, Vardoulakis, in somewhat exhaustive fashion, once again conveyed his thoughts, the problems they face and his suggested solutions.  Vardoulakis followed up by email dated March 25, 2021, in which among other things, he proposed certain  cost cutting measures.  Aside from the substance of these emails, the thread that is apparent throughout the same is Vardoulakis' continued plea to Neri to meet and discuss these issues.  Neri responded by again deflecting Vardoulakis' contentions, predictions, and concerns.[11]   Without deciding the issue of who is right and who is wrong in this matter, what is obvious about these exchanges and at this juncture, if not well before, is that there was a distinct difference between the parties as to how CTL should operate and conduct business on a go forward basis, and a resulting material change in nature of how the business operates, the specifics of which triggered one or more of the fundamental matters listed in the Buy-Sell, which Deadlock had been ongoing at least since February 8, 2021, or March 22, 2021, despite good faith deliberations by Vardoulakis for at least 30 days from either date set forth above, assuming Neri had not repudiated and breached that term before the expiration of such 30 period.  What is also equally obvious is that the parties are at a Deadlock on such matters.  This Deadlock continued to play out in the parties' subsequent emails, dated March 26, 2021, and thereafter, to date, to

_____

[11]   What is clearly evident here is that there was never an honest effort by Neri to address and discuss Vardoulakis' raised concerns.   By way of example, in the March 22, 2021 exchanges, although Neri was told that for their largest client, voyages were, on average,  taking, say 13.5 days, and, therefore, was less or not profitable, particularly when the vessel's capacity was not fully utilized, which was exacerbated by a lack of  prompt payment.   Amazingly, Neris' response was to ignore the reality of what was actually happening, stating, but the voyage was scheduled to take 10 days and so CTL's profitability analysis of the voyage, as presented by Vardoulakis, should be based on 10 days, and based upon the same, it was profitable!!   At the same time,  Neri arbitrarily increased the fixed, by contract, freight rates to higher amounts, without explanation or basis.  Of course, with the application of these two fictions, Neri's position was essentially, what's the problem?

include the recent public disclosure of CTI's termination and the ascendancy of Neri as a sole proprietor.[12]

As predicted by Vardoulakis, on April 5, 2021, Parchem III, the entity with whom CTL leased with a put/call option to buy two vessels, notified CTL of its intent to sell the two vessels CTL's leased from it, thus initiating early the process by which CTL would ultimately have to buy the vessels or lose them and likely the millions it placed as security. Not surprisingly, on the same date, Vardoulakis offered to buy Neri's interest in CTL. On April 6, 2021, CTL's creditor **Bourla,** demanded payment of a $400,000.00 delinquent note and, contemporaneously, Columbia Ship Management notified Neri of its demand for the payment of 1.6 million dollars owed to it by CTL, and Neri, on cue, made demand on Vardoulakis for $600,000.00, pursuant to the Promissory Note accompanying the Subscription Agreement, described above. No tender of the 16 shares of CTL accompanied the demand for $600,000.00. By emails dated April 12, 13, 15, and 15, 2021, the parties exchanged emails wherein Neri provided one explanation after another as to the basis for the $600,000.00 demand. Make no mistake, there was no transfer of $600,000.00 from Neri to Vardoulakis in return for a Promissory Note that is independent from the terms of the Subscription Agreement, and Neri has provided no evidence of the same. These emails further evidence that the Deadlock in the direction of the Company continued between the parties. Invariably, in the midst of these communications, Vardoulakis issued the CTL Company Status Report, dated April 12, 2021, which set forth, among other things, the Company's history,

---

[12] Upon information and belief, this public disclosure has lead to a loss in confidence by CTL's creditors, lenders, vendors, and the calling of several of its debts by the same and the premature offering for sale of 2 of CTL's vessels by their owners, all of which was predicted by Vardoulakis should things not change, which have now been accelerated by Neri's actions. (see facts)

its current financial condition, financial predictions, scenarios, proposed resolutions, and CTI's operational responsibilities.

On April 23, 2021, Neri forwarded Vardoulakis an email in which he describes as a Settlement Proposal, and, thereafter, on April 30, 2021, provided the fourth separate and independent basis for his demand for $600,000.00 from Vardoulakis. More importantly, in the same email where Neri offers the fourth explanation for the $600,000.00, he rejected out of hand Vardoulakis' tender of $600,000.00 to Neri in return for the 16 shares of stock, pursuant to the Subscription Agreement, Neri's own demand, and the very Promissory Note upon which Neri demanded $600,000.00.[13]

**Buy-Sell Triggered**

Notwithstanding any argument that Neri's April 23, 2021 Settlement Proposal triggered the Buy-Sell, on May 3, 2021, Vardoulakis sent Neri an email rejecting his Settlement Proposal, and independently triggered the Buy-Sell by offering to buy Neri's shares for 1.4 million dollars. A copy of Vardoulakis May 3, 2021 letter is attached hereto as **Exhibit E**.

Specifically, the buy-sell provisions regarding a Deadlock are governed by Sections 2.2, 2.3, and 2.4 of the Buy-Sell, and state the following:

> 2.2 **Buy Sell Offer Notice**. If a Shareholder wishes to exercise the buy-sell right provided in this Article, such Shareholder (the "Initiating Shareholder") shall deliver to the other Shareholder (the "Responding Shareholder") written notice (the "Buy-Sell Offer Notice") of such election, which notice shall include (a) a description of the circumstances that triggered the buy-sell right, and (b) the purchase price on a per share basis (which shall be payable exclusively in cash (unless otherwise agreed)) at which price the Initiating Shareholder shall (i) purchase all of the Stock owned by the

---

[13] Essentially Neri's position seems to be you owe me $600,000.00 because there is a note that says you do and I need the money.

Responding Shareholder (the "Buy-out Price") or (ii) sell all of his Stock to the Responding Shareholder (the "Sell-out Price"), with any difference between the Buy-out Price and the Sell-out Price based solely on the number of shares owned by the "selling" Shareholder multiplied by the per share price set forth in (b) above.

2.3 **Response Notice**. Within thirty (30) days after the Buy-Sell Offer Notice is received  (the "Buy-Sell Election Date"), the Responding Shareholder shall deliver to the Initiating Shareholder a written notice (the "Response Notice") stating whether he elects to (a) sell all his Stock to the Initiating Shareholder for the Buy-out Price or (b) buy all of the Stock owned by the Initiating Shareholder for the Sell-out Price.  The failure of the Responding Shareholder to deliver the Response Notice by the Buy-Sell Election Date shall be deemed an election to sell all of his Stock to the Initiating Shareholder at the Buy-out Price.

2.4 **Closing**.  The closing of any purchase and sale of Stock pursuant to this Agreement shall take place thirty (30) days after the Response Notice is delivered or deemed to have been delivered or some other date mutually agreed upon by the parties.   The Buy-out Price or the Sell-out Price, as the case may be, shall be paid at closing by wire transfer or immediately available funds to an account designated in writing by the Seller Shareholder.

In compliance with Section 2.2 of the Buy-Sell, Vardoulakis' May 3, 2021  letter states in the first paragraph the purchase price for Neri's 56 shares, (1.4 million dollars), in the next to the last paragraph it states and sets forth a description of the circumstances that triggered the buy-sell right, and that such purchase price shall be in cash for all of Neri's shares, thus complying with Section 2.2 of the Buy-Sell.   Although Neri had thirty days to respond under Section 2.3, he responded on May 4, 2021, in which among other things, he rejected Vardoulakis Buy-Sell offer, stating, *"To the extent your letter dated May 3, 2021 is an offer to purchase my shares, thereby triggering the Buy-Sell Agreement, it is rejected, and I will consider whether to exercise my right*

11

*to buy your shares at the same price share you have proposed."* [14]   A copy of Neri's May 4, 2021 response is attached hereto as **Exhibit F**. Clearly, Neri's May 4, 2021 email responds to Vardoulakis Buy-Sell offer in writing rejecting the Buy-Sell offer, at which point the only alternative he has is to buy all of the stock owned by the initiating shareholder under 2.3(b), for which Vardoulakis seeks specific performance on June 3, 2021, as set forth below.   Of course, should Neri take the position that his May 4, 2021 letter was no response under Section 2.3, then upon the passage thirty days from May 3, 2021, unless he chooses to sell under 2.3(a) or buy under 2.3(b), the Buy-Sell will presume his election to sell to Vardoulakis, which eventuality supports Vardoulakis' request for a TRO and, thereafter, a Temporary Injunction to preserve the status quo of the Company given Neri's unilateral actions and poor decisions, as more fully set forth below, so that the value of the Company is preserved, the Buy-Sell right upon a Deadlock in Fundamental Matters is not rendered illusory, and the value of Company and Vardoulakis' stock is preserved.[15]   The tone and content of Neri's email, however, supports the position that Neri, as he has with the operation of the Company, has no intention of complying with the same, but rather to act on the same as he individually pleases, and, therefore, his May 4, 2021 email should be considered as a repudiation of the Buy-Sell, upon which Vardoulakis files this suit for Breach

---

[14]    In addition to rejecting Vardoulakis Buy-Sell offer, in his May 4, 2021 email, Neri offers therein the 5th reason why he believes that Vardoulakis owes him $600,000.00. He also confirms his belief that he has terminated CTI, removed Vardoulakis as a Director and Officer and even though Vardoulakis is a shareholder, essentially forbids his involvement with CTL, which ends with a threat that if he does not just go away with nothing, he will sue him.

[15]  To the extent the Buy-Sell has not been triggered by anyone, the TRO is necessary to preserve the status quo, *e.g.*, the value of the Company and its Good will, so that right will not be rendered illusory, not to mention preventing the reduction in value of Vardoulakis' stock in general.

of Contract for the same.   Invariably, Vardoulakis made Neri aware of his position in these regards, and as a shareholder, requested that Neri provide him with access to the Company's financials.   Neri responded by stating the same were available for his personal inspection in Mexico, which access would apply for any subsequent request.   All of the Company's financials are computerized and fully available digitally.   Upon information and belief, Neri has boasted to others that he has no intention of buying Vardoulakis' shares, and, to date, he has failed and refused to buy, close and continues operating CTL in violation of the Buy Sell.   In this regard, in order to protect the Buy-Sell rights of the parties when a Deadlock is reached, it should presume or mean that the Company's status quo will be preserved, versus what Neri has done, to include but not limited to firing CTI without authority, removing Vardoulakis as Director (ostensibly as an Officer as well), refused to provide him with financial access,   proceeded down an operationally destructive path, which, in addition to what has been stated thus far, will be set forth more fully to support Vardoulakis' claim that Neri breached his fiduciary duties to the Company and his request for a TRO and Temporary Injunction, and to restore and preserve the status quo prior to Neri's actions, otherwise, the Company's value will be destroyed, un-repairable, and the Buy-Sell rights will be rendered illusory.

***Failure to Comply with Corporate Formalities***

Although the firing of CTI was reserved by the Company as an exclusive act of CTL's Board of Directors, no Board of Directors meeting was held for that purpose, nor to remove Vardoulakis as an officer of the Company, although Neri states Vardoulakis is no longer an officer.[16]   To the contrary, both the firing of CTI and, ostensibly, the removal of Vardoulakis as

---

[16]   Practically, Vardoulakis has been shut out of all matters pertaining to the Company, to include its financials, emails, contacts, and communication.  Accordingly, he

13

an officer, although no mention is made of the same in the shareholder meeting minutes, were performed at a shareholders' meeting on April 16, 2021, in which Neri, asserting his majority, terminated CTI by voting to ratify his illegal individual and unilateral decision back in March 2021 to fire CTI, for which he had no authority rendering such act void as a result, and not subject to being ratified, versus holding a subsequent Board of Directors meeting and properly firing CTI and voting Neri to all the officer positions.  Since that time, Neri has taken several actions that he clearly knows are objectionable to Vardoulakis, yet he has taken the same without conducting any corporate shareholders' meeting.  He has, likewise, refused to allow Vardoulakis access to the Company in all respects and, to that end, has taken a previously valid corporation and turned into his own personal tool, and, otherwise, a sham corporation, also supporting a Deadlock on a fundamental matter.

## IV.
## CAUSES OF ACTION

The above and foregoing facts support the following causes of action by Vardoulakis:

a.      The breach of the Buy-Sell, or alternatively, the repudiation of the same and the resulting Anticipatory Breach of the Buy-Sell, to include but not limited to failing to comply with Sections 2.2, 2.3, and 2.4 of the same, failing to comply with the purpose and intent of a Deadlock situation, and the failure to enter into good faith negotiations as called for therein;

b.      Vardoulakis seeks specific performance of the Buy- Sell, requiring Neri to purchase his shares (to be determined herein), for no less than $600,000.00;

---

is precluded from performing in any capacity to include the assertion of his rights as a shareholder.

c.     Alternatively, as necessary, Vardoulakis seeks this Court's declaration of the following:

    (i)      That a Deadlock existed between the parties of a Fundamental Matter, as defined in the Buy-Sell;

    (ii)     That the same existed for at least thirty days before the Buy-Sell right was triggered or was repudiated or breached by Neri;

    (iii)    that Neri failed to negotiate the matters in good faith;

    (iv)     that Vardoulakis properly triggered his Buy-Sell right; and

    (v)      That Neri rejected the offer and was thus obligated to purchase Vardoulakis stock for at least $600,000.00, at a closing thirty days afer his rejection, *e.g.*, June 3, 2021.

d.     The breach of the Subscription Agreement by Neri, which then entitles Vardoulakis to assert his 50% interest in CTL, thus voiding all Neri's unilateral act in reliance on his asserted 70% interest in CTL, to include his firing of CTI and his removal of Vardoulakis as an Officer and Director of CTL, for which 50% percent interest, Vardoulakis also seeks declaratory judgment from this Court.

e.     Vardoulakis, on behalf of the Company, and himself to the extent the law allows, asserts that Neri, President of the Company, has violated his fiduciary duties to the Company and to Vardoulakis, as the law allows, in the following respects, which is not a comprehensive list, most of which have occurred since Neri took sole control over the last few weeks:

(i)     Fired CTL's longstanding agent without cause, to include abandoning its institutional knowledge, experience, and expertise, followed by precluding CTI and Vardoulakis, (its principal), access to the Company, not having reasonable replacement in hand or strategy, to include the failure to instigate a transition from CTI for the benefit of CTL, and taking on operational responsibilities for which he was not qualified;

(ii)    Failing to comply with the Company's By -Laws,  failing to maintain the Company's corporate formalities, and, otherwise, treating the Company's assets as his own personal tool and rendering the Company a Sham entity;

(iii)   Ignoring all information and input that did not fit Neri's goal, desires, and narrative, which jeopardized the Company;

(iv)    Firing Vardoulakis as Director and Officer, without cause to achieve his personal goals, and, otherwise, decapitating the Company's leadership and assets, for his personal benefit, and shutting off all dissent or communication;

(v)     Publically announced the firing of CTI, causing a loss of confidence in CTL, resulting in the calling of loans, demands for payment and the acceleration of events regarding the Company's vessels;

(vi)    Failing to follow Company guidelines and Covid-19 protocols, established, closely monitored, and enforced by CTI,  which caused the grounding of a ship for 14 days and possibly more at a loss or rise in debt of at least $500,000.00. No such event occurred prior to Neri's ascendancy, to include during the peak of the pandemic;

16

(vii)   Left the fleet without any technical supervision or cost controls;

(viii)  Dropped all IT systems assigned to monitor the vessels' performance;

(ix)    Left CTL without USA credit relationships;

(x)     Has failed to implement a Budget;

(xi)    By firing CTI, has lost the institutional knowledge, experience, and expertise of the administration and prosecution of CTL's insurance claims, valued at north of 4.5 million dollars;

(xii)   Jeopardized the insurance coverage for CTL's vessels as there is no USA entity involved;

(xiii)  Has idled half of the fleet for which daily fees accrue without possibility of revenue;

(xiv)   Pursued risky business ventures, which expose the Company to multimillion dollar liability, without specific insurance coverage or confirmed indemnification for CTL;

(xv)    Has severed the relationship's with the Company's creditors, and/or lenders and/or its vendors, which relationships allowed for flexibility with purchasing on credit, payment terms, *etc.*;

(xvi)   Abandoned any representation of CTL in Houston, which enjoys the 4-5th biggest port in the world;

(xvii)  The required dry docking of the *Caribe Liza* is at hand and there is no plan in place to pay for the same;

(xviii) No viable plan is in place to purchase the vessels and protect the security deposits paid, which process has begun;

17

(ixx)   The mishandling of the current 4.5 million dollar insurance claim after shutting out Vardoulakis and CTI, despite advice to the contrary for which Vardoulakis has offered his assistance even, to date; and

(xx)   Neri has agreed to the tri-parte selling of one of the 2016 vessels without considering the debt, previously negotiated from the same,  and the necessary structure for such sale.

f.   Vardoulakis also seeks a declaratory judgment that CTI was never properly terminated but was precluded from performing.

## V.
## <u>INJUNCTIVE RELIEF SOUGHT</u>

Further, Vardoulakis also seeks a Temporary Restraining Order and Temporary Injunction which establishes and preserves the status quo of the Company in terms of the number and membership of people on the Board of Directors that existed prior to March 22, 2021, re-establishing CTI as its manager  and the  benefits it provides to the Company, confirming Vardoulakis as an officer, precluding Neri from making unilateral decisions regarding the operation of the Company without Vardoulakis' consent or approval, thus  preserving the value of the Company, the value of the shareholders' stock, protecting the Deadlock that exits, and the Buy-Sell rights of the shareholders to either enforce the Buy-Sell offer, or alternatively preserving the right to trigger the shareholders' Buy-Sell rights, and finally to grant digital access to the Company's books and records to Vardoulakis, to include access to its financial records and generally access to the same as he previously enjoyed prior to being shut out.  Harm accrues every day in this business, one way or the other, to include by virtue of the unilateral acts of Neri, as enumerated in items e.(i) through e.(xx) above as well as the background facts set forth in the

18

Facts section of this lawsuit. The list of items in ei-xx above and the background facts are incorporated here again in support of Vardoulakis' request for injunctive relief.  Time is of the essence.  If Neri is not immediately restrained from making unilateral acts and the status quo prior to March 22, 2021 is not restored, the Company's value, and its assets will be lost, the shareholders' share value will be lost, and the Buy-Sell, which the parties executed to address this very situation, will be frustrated and rendered illusory, along with the Buy-Sell rights of the parties, all resulting in irreparable harm to Vardoulakis and the Company, for which neither has an adequate remedy at law.  Based on the above and foregoing, Vardoulakis and the Company are likely to succeed in this case, particularly if the requested injunctive relief is granted.[17]   Further, given the circumstances and the facts set forth herein, to include the lack of control that Vardoulakis has in the matter, in the event TRO and/or a Temporary Injunction is granted, Plaintiff requests that the bond be set in an minimal amount, as all that is requested is the return of the Company to its status prior to March 22, 2021.

## VI.
## DAMAGES

As a result of the Defendant's acts and omissions as set forth above, the Plaintiffs have incurred damages, which are in excess of the minimum jurisdictional limits of this Court.  More specifically, Plaintiff seeks damages in an amount in excess of $10,000,000.00.

---

[17]   The current situation has left Vardoulakis silenced, unrepresented, unprotected, his stock in the Company and the value of the Company itself jeopardized, and striped of all ability to protect either. This includes his ability to make an income or time charter a vessel for fear of the same being considered interfering with CTL while a shareholder,  for which he was previously threatened in Neri's May 4, 2021 email. Upon information and belief, this has been followed and reinforced by statements, ostensibly  by Neri, that Vardoulakis is also no longer even involved with CTL.

## VII.
## ATTORNEYS' FEES

Furthermore, as a result of the Defendant's acts and omissions, as set forth above, the Plaintiff has been forced to hire an attorney to enforce its right of recovery, for which the Plaintiff has incurred reasonable attorneys' fees, and which the Plaintiff also seeks to recover from the Defendants, as provided by law, as well as pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code, and as allowed by contract.  The Plaintiff seeks its attorneys' fees through any trial, appeal to the court of appeals, and any appeal to the Texas Supreme Court.

## VIII.
## JURY DEMAND

Plaintiff hereby asserts his right to a trial by jury under the Texas Constitution and makes this demand for trial by jury in accordance with Texas Rule of Civil Procedure 504.

## IX.
## CONCLUSION & PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant, EDUARDO NERI, be cited to appear and answer herein, and that upon a trial of this cause, that he have a judgment of and from the Defendant for his actual damages, pre- and post judgment interest on all damages awarded to Plaintiff, injunctive relief as requested herein, costs of court, reasonable attorneys' fees, post-judgment interest on Plaintiff's attorneys' fees and costs of court, additional attorneys fees in the event of an appeal of the case to the Court of Appeals and/or the Texas Supreme Court, and any and all other relief under law or equity to which the Plaintiff is entitled.

Respectfully submitted,

DABNEY PAPPAS

By:  /s/ Gus E. Pappas
    Gus E. Pappas
    State Bar No. 15454850
    gus@dabneypappas.com
    1776 Yorktown, Suite 425
    Houston, Texas 77056
    713-621-2678 Telephone
    713-621-0074 Facsimile

ATTORNEY FOR PLAINTIFF

CAUSE NO. _____

| | | |
|---|---|---|
| ALEXIOS VARDOULAKIS, | § | IN THE DISTRICT COURT |
| INDIVIDUALLY AND ON BEHALF | § | |
| OF CARIBE TANKERS, LTD., | § | |
| | § | |
| Plaintiff, | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| v. | § | |
| | § | |
| EDUARDO NERI, | § | |
| | § | |
| Defendant. | § | _____ JUDICIAL DISTRICT |

## <u>AFFIDAVIT OF ALEXIOS VARDOULAKIS</u>

BEFORE ME, the undersigned authority, on this day personally appeared Alexios Vardoulakis, known to me to be the person whose name is affixed to this affidavit, and having been duly sworn, upon his oath, stated as follows:

1. "My name is Alexios Vardoulakis. I am over the age of 18, and am, otherwise, fully competent to make this affidavit. All of the statements contained in this affidavit are true and correct and based upon my personal knowledge."

2. On or about June 12, 2009, Caribe Tankers, LTD, a corporation, was established in the Marshall Islands, ("CTL" or the "Company"), in which I owned twenty (20) shares, Defendant, Eduardo Neri, ("Neri"), owned sixty (60) shares, and Spiridon Konstantinos Papanikolaou owned twenty (20) shares, of the 100 shares that the Company issued.   On August 18, 2009, myself and the other two Shareholders, who also constituted the Board of Directors for the Company, executed the By-Laws of CTL and began operating contemporaneous therewith as a time charter entity.[1] CTL is arguably still in good standing and validly existing and, to this day, operates as a Marshall Island corporation.

---

[1] Time chartering cargo vessels is like renting a fully furnished and stocked apartment.   A time charterer pays the owner of the vessel a daily fee for the use of a fully crewed and operating vessel.  The time charterer is responsible to pay for the fuel, port costs, and undertake charter liability insurance.  The time charterer's only other responsibility is to find customers with cargo to transport.  A time charterer's daily fee,  insurance, and fuel costs accrue and is due whether the vessel is sitting idle in port or transporting goods on the seas.

1

EXHIBIT 1

3.       On January 1, 2010, CTL entered into a Commercial Management Agreement ("CMA"), with an entity called Caribe Tankers, Inc., ("CTI"), in which the Company engaged CTI, as set forth in the CMA, *"...to act as its agent/manager to provide commercial management services as set forth below and Caribe Tankers, Inc., agrees to accept said engagement"*.   On or about June 4, 2012, CTI and CTL entered into Amendment I to the CMA, ("CMA I") which, ostensibly, was a reprise of the CMA but with a new expiration date.   Contemporaneously, and perhaps the basis for the CMA I, Mr. Papanikolaou's shares were re-acquired by the Company, thus leaving me with 25 percent of the Company and Neri with 75 percent.   Thereafter, on or about April 25, 2014, I  acquired 4 additional shares from Neri, leaving me with 24 shares, and Neri with 56 shares, and 30 and 70 percent ownership in the Company, respectively, as of that date.   On April 25, 2014, Neri and I entered  into a Buy-Sell Agreement, ("Buy-Sell"), a true and correct copy of which is attached hereto as **Exhibit A**.[2]   In addition to dealing with issues of death, divorce, termination of employment, *etc.*, this one included a procedure for the purchase and sale of each of the shareholders' percentage to the other if and when a deadlock existed between us on fundamental matters, as listed in the Buy-Sell.  In or about late 2015 and early 2016, the Eduardo and I decided to move from exclusively the time charter business to lease to the potential ownership of 3 cargo vessels. This was a decided shift in the Company's business model.[3] Contemporaneously, we entered into a Subscription Agreement on or about January 1, 2016, a part of which included the equalization of ownership in the Company, accompanied by a $600,000.00 Promissory Note from myself, payable to Neri, to accomplish the same.   True and correct copies of the Subscription Agreement, along with its accompanying Promissory Note, are attached hereto as **Exhibit B**.   Neri recently, (April 12, 2021), made demand for the payment of the $600,000.00. In response to the demand, I  timely tendered $600,000.00 in return for the transfer of the 16 shares to me to equalize our ownership in the Company.  It should be noted

---

[2]  Although titled as "First Amended Buy Sell Agreement", Exhibit A is the only buy sell agreement entered into by the parties.

[3]  As opposed to a time charter, in this model, CTL rented the bare boat (the steel only) for a daily fee, *e.g.*, $3,450.00 a day, and was responsible for everything else.  The theory and goal was that CTL could operate the vessel for less than the time charter vessel owner's daily fee, and there was a purchase mechanism 5 years later, which incorporated a several million dollar deposit, that depending on the circumstances, was applied to the purchase purpose or diminished in part or could be lost in whole.

that despite the Subscription Agreement's entry in 2016 and my execution of the Promissory Note, Neri never tendered the 16 shares to me in accordance with the Subscription Agreement. Moreover, even after Neri's demand for the $600,000.00 and my tender of the same, Neri failed and refused to transfer the 16 shares of stock of the Company to me, again,  in violation of the Subscription Agreement.

4.     On March 23, 2016, CTL and CTI entered into a second amended CMA, (the CMA II), the term of which was 12 months, automatically renewing for successive 12 month periods unless terminated by the parties, in accordance therewith.[4]

5.     The Company proceeded to enter into lease to own contracts for 3 cargo ships in 2016 and in 2017 added an additional 2 vessels to the fleet, and began operating in such fashion.[5]  In May 2019, I obtained a financial analysis, which predicted a financial crisis should the Company continue as it was.  In furtherance of such impending financial troubles, the Company, through my efforts, began looking to refinance CTL's debt in or about April of 2020.   There was no consensus between Neri and I on that approach as Neri dismissed the efforts as pre-mature. Further, the financial models of the Company's revenue stream indicated that the Company would not have the funds to pay for the mandated and scheduled dry docking of one of the Company's cargo ships, the *Caribe Liza.*[6]   Likewise, there was no consensus between the us on the matter, as Neri again dismissed my concerns as the scheduled dry docking was still 6 months away.   The impending financial crisis came to a head in February 2021 when we  spoke by *zoom,* during which conference I again raised the alarm on the Company's financial issues, expressly outlining the impending doom and the dominoes that would soon fall if something was not done, which presentation was accompanied with supporting materials.[7]  For at least the third

---

[4]  The title of the CMAII is different as well as its content, which reflect CTI's additional responsibilities and duties therein, as direct result of the change in the business model of CTL.

[5]  In 2016 CTL leased 3 vessels, adding another 2 in 2017, adding another and then selling one in 2019, selling one in 2020, selling another and adding one time charter vessel in 2021, leaving CTL with 2 vessels from 2016, 1 from 2019, and the time charter vessel, at present.

[6]  The same held true for the *Caribe Cristina*, and the *Caribe Maria* 6 months later.  The cost of each dry docking per vessel is approximately 1.2 million dollars.  My refinancing effort was also made, in part, to pay for these required dry dockings.

[7]  There were at least two other people in attendance at the February 8, 2021 conference.

time, Neri dismissed the alarms and data and deferred the matter.  It was now clear a deadlock existed between us regarding the direction and operation of CTL. What ensued, thereafter, was a series of emails between us which further evidenced the divide.  On March 22, 2021, I forwarded a memorandum regarding CTL's financial condition.  A true and correct copy of my email with memorandum is attached hereto as **Exhibit C.   Neri's response, that same day, was to unilaterally terminate the CMA II, and, ostensibly, CTI.  It should be noted that CTI had been CTL's agent, sole operational and commercial and technical management arm since CTL's inception, to include possessing all of its institutional knowledge, experience and expertise.**  Although a Deadlock, as that term is defined in the Buy-Sell, is surely to have occurred prior to March 22, 2021, Neri's actions of that date clearly evidence a Deadlock on at least one or more of the Fundamental Matters, as listed in the Buy-Sell, and arguably, at the same time,  the repudiation and breach of the Buy-Sell's requirement for good faith negotiations for 30 days, assuming the Deadlock had not begun earlier, *e.g.*, on February 8, 2021.[8]  Notwithstanding the fact that Neri had no authority to terminate the CMA II as an individual, he also had no authority to terminate the CMA II as a shareholder, as such action was an act that was within the exclusive province of CTL's Board of Directors.[9]  A true and correct copy of Neri's March 22, email in response is attached hereto as **Exhibit D**.  Further, no where did Neri explain how he was to going to replace the work that CTI performed for CTL, at what cost, or savings, nor how he intended to bridge the tremendous gap in institutional knowledge, experience and expertise of CTI, as he had historically left all such work and oversight to me and CTI.  Of course, Neri's announcement was also in the face of my previously conducted analysis of the savings, if any, that could be had with the replacement of CTI.  The analysis indicated that the crisis was not solely or materially brought on by any excessive cost elements, to include CTI's management fees. To the contrary, the crisis was brought on by CTL's critical failure to maximize revenues, which was exacerbated by CTL's myopic reliance on one large client, which

---

[8]  On top of the obvious termination of CTI, the actions of Neri evidenced going from a corporation that was run by both shareholders, and a board of directors, to a sole proprietorship where Neri simply did what he wanted, to include but not limited to operating the Company as his own personal tool, failing to comply with corporate formalities, and creating a sham entity.

[9]  Of this fact, CTL's acting corporate counsel advised the parties in writing.

was not so ironically one that was cultivated by Neri.[10]  It is also not ironic that Neri took action, *albeit* without authority, only when I took aim at the revenue side, which expressly targeted Neri's harvested client.  In furtherance of full disclosure, by email dated March 23, 2021, Neri responded, after feigning ignorance of my previously proffered solutions, *e.g.*, the proffer of which had begun well before, but certainly by February 8, 2021.  In any event, I had expressly made Neri aware of my intended solutions, on several occasions, which included, at a minimum, approaching CTL's largest client about maximizing cargo on its ships and thus CTL's revenue.  Neri, of course, myopically, again solely focused on CTL's expenses, which analysis I had already performed and passed along to Neri.  By email dated March 24, 2021, I, in somewhat exhaustive fashion, once again conveyed my  thoughts, the problems CTL faces and my suggested solutions.  I followed up by email dated March 25, 2021, in which among other things, I proposed certain  cost cutting measures.  Aside from the substance of these emails, the thread that is apparent throughout the same is my continued plea to Neri to meet and discuss these issues.  Neri responded by again deflecting my contentions, predictions, and concerns.[11]  Without deciding the issue of who is right and who is wrong in this matter, what is obvious about these exchanges and at this juncture, if not well before, is that there was a distinct difference between us as to how CTL should operate and conduct business on a go forward basis, and a resulting material change in nature of how the business operates, the specifics of which triggered one or more of the fundamental matters listed in the Buy-Sell, which Deadlock had been ongoing at least since February 8, 2021, or March 22, 2021, despite my good faith deliberations for at least

---

[10]  In my email of March 22, 2021, **Exhibit C** hereto, he expressly suggested solutions to the crisis, which included approaching CTL's largest client about CTL's need to maximize the hauling of cargo on CTL runs involving that client and tightening that client's payment terms.  Neri objected to the same.

[11]  What is clearly evident here is that there was never an honest effort by Neri to address and discuss my raised concerns.  By way of example, in the March 22, 2021 exchanges, although Neri was told that for their largest client, voyages were, on average,  taking, say 13.5 days, and, therefore, was less or not profitable, particularly when the vessel's capacity was not fully utilized, which was exacerbated by a lack of  prompt payment.  Amazingly, Neris' response was to ignore the reality of what was actually happening, stating, but the voyage was scheduled to take 10 days and so CTL's profitability analysis of the voyage, as presented by me, should be based on 10 days, and based upon the same, it was profitable!!   At the same time,  Neri arbitrarily increased the fixed, by contract, freight rates to higher amounts, without explanation or basis.  Of course, with the application of these two fictions, Neri's position was essentially, what's the problem?

30 days from either date set forth above, assuming Neri had not repudiated and breached that term before the expiration of such 30 period.  What is also equally obvious is that we are at a Deadlock on such matters.  This Deadlock continued to play out in our subsequent emails, dated March 26, 2021, and thereafter, to date, to include the recent public disclosure of CTI's termination and the ascendancy of Neri as a sole proprietor.[12]

6.  As I predicted, on April 5, 2021, Parchem III, the entity with whom CTL leased with a put/call option to buy two vessels, notified CTL of its intent to sell the two vessels CTL's leased from it, thus initiating early the process by which CTL would ultimately have to buy the vessels or lose them and likely the millions it placed as security.  Not surprisingly, on the same date, I offered to buy Neri's interest in CTL.  On April 6, 2021, CTL's creditor **Bourla,** demanded payment of a $400,000.00 delinquent note and, contemporaneously,  Columbia Ship Management notified Neri of its demand for the payment of 1.6 million dollars owed to it by CTL, and Neri, on cue, made demand on me for $600,000.00, pursuant to the Promissory Note accompanying the Subscription Agreement, described above.   No tender of the 16 shares of CTL accompanied the demand for $600,000.00.   By emails dated April 12, 13, 15, and 15, 2021, we exchanged emails wherein Neri provided one explanation after another as to the basis for the $600,000.00 demand.  Make no mistake, there was no transfer of $600,000.00 from Neri to me in return for a Promissory Note that is independent from the terms of the Subscription Agreement, and Neri has provided no evidence of the same.   These emails further evidence that the Deadlock in the direction of the Company continued between the parties.  Invariably, in the midst of these communications, I issued the CTL Company Status Report, dated April 12, 2021, which set forth, among other things, the Company's history, its current financial condition, financial predictions, scenarios, proposed  resolutions, and CTI's operational responsibilities.

7.  On April 23, 2021, Neri forwarded me an email in which he describes as a Settlement Proposal, and, thereafter, on April 30, 2021, provided the fourth separate and independent basis for his demand for $600,000.00 from me.  More importantly, in the same email where Neri offers the fourth explanation for the $600,000.00, he rejected out of hand my tender of $600,000.00 to

---

[12]  Upon information and belief, this public disclosure has lead to a loss in confidence by CTL's creditors, lenders, vendors, and the calling of several of its debts by the same and the premature offering for sale of 2 of CTL's vessels by their owners, all of which I  predicted should things not change, which have now been accelerated by Neri's actions.  (see facts)

Neri in return for the 16 shares of stock, pursuant to the Subscription Agreement, Neri's own demand, and the very Promissory Note upon which Neri demanded $600,000.00.[13]

8.    Notwithstanding any argument that Neri's April 23, 2021 Settlement Proposal triggered the Buy-Sell, on May 3, 2021, I sent Neri an email rejecting his Settlement Proposal, and independently triggered the Buy- Sell by offering to buy Neri's shares for 1.4 million dollars.  A true and correct copy of my May 3, 2021 letter is attached hereto as **Exhibit E.**

9.    Specifically, the buy-sell provisions regarding a Deadlock are governed by Sections 2.2, 2.3, and 2.4 of the Buy- Sell, and state the following:

2.2    **Buy Sell Offer Notice**.  If a Shareholder wishes to exercise the buy-sell right provided in this Article, such Shareholder (the "Initiating Shareholder") shall deliver to the other Shareholder (the "Responding Shareholder") written notice (the "Buy-Sell Offer Notice") of such election, which notice shall include (a) a description of the circumstances that triggered the buy-sell right, and (b) the purchase price on a per share basis (which shall be payable exclusively in cash (unless otherwise agreed)) at which price the Initiating Shareholder shall (i) purchase all of the Stock owned by the Responding Shareholder (the "Buy-out Price") or (ii) sell all of his Stock to the Responding Shareholder (the "Sell-out Price"), with any difference between the Buy-out Price and the Sell-out Price based solely on the number of shares owned by the "selling" Shareholder multiplied by the per share price set forth in (b) above.

2.3    **Response Notice**. Within thirty (30) days after the Buy-Sell Offer Notice is received  (the "Buy-Sell Election Date"), the Responding Shareholder shall deliver to the Initiating Shareholder a written notice (the "Response Notice") stating whether he elects to (a) sell all his Stock to the Initiating Shareholder for the Buy-out Price or (b) buy all of the Stock owned by the Initiating Shareholder for the Sell-out Price.  The failure of the Responding Shareholder to deliver the Response Notice by the Buy-Sell Election Date shall be deemed an election to sell all of his Stock to the Initiating Shareholder at the Buy-out Price.

2.4    **Closing**.  The closing of any purchase and sale of Stock pursuant to this Agreement shall take place thirty (30) days after the Response Notice is delivered or deemed to have been delivered or some other date mutually agreed upon by the parties.   The Buy-out Price or the Sell-out Price, as the case may be, shall be paid at closing by wire transfer or immediately available funds to an account designated in writing by the Seller

---

[13]  Essentially Neri's position seems to be you owe me $600,000.00 because there is a  note that says you do and I need the money.

Shareholder.

10.   In compliance with Section 2.2 of the Buy-Sell, my May 3, 2021 letter states in the first paragraph the purchase price for Neri's 56 shares, (1.4 million dollars), in the next to the last paragraph it states and sets forth a description of the circumstances that triggered the buy-sell right, and that such purchase price shall be in cash for all of Neri's shares, thus complying with Section 2.2 of the Buy-Sell.   Although Neri had thirty days to respond under Section 2.3, he responded on May 4, 2021, in which among other things, he rejected my Buy-Sell offer, stating, *"To the extent your letter dated May 3, 2021 is an offer to purchase my shares, thereby triggering the Buy-Sell Agreement, it is rejected, and I will consider whether to exercise my right to buy your shares at the same price share you have proposed."* [14]   A true and correct copy of Neri's May 4, 2021 response is attached hereto as **Exhibit F**. Clearly, Neri's May 4, 2021 email responds to my Buy-Sell offer in writing rejecting the Buy-Sell offer, at which point the only alternative he has is to buy all of the stock owned by the initiating shareholder under 2.3(b), for which I seek specific performance on June 3, 2021, as set forth below.   Of course, should Neri take the position that his May 4, 2021 letter was no response under Section 2.3, then upon the passage thirty days from May 3, 2021, unless he chooses to sell under 2.3(a) or buy under 2.3(b), the Buy-Sell will presume his election to sell to me, which eventuality supports my request for a TRO and, thereafter, a Temporary Injunction to preserve the status quo of the Company given Neri's unilateral actions and poor decisions, as more fully set forth below, so that the value of the Company is preserved, the Buy-Sell right upon a Deadlock in Fundamental Matters is not rendered illusory, and the value of Company and my stock is preserved.[15]   The tone and content of Neri's email, however, supports the position that Neri, as he has with the operation of the Company, has no intention of complying with the same, but rather to act on the same as he individually pleases, and, therefore, his May 4, 2021 email should be considered as a repudiation

---

[14]   In addition to rejecting my Buy-Sell offer, in his May 4, 2021 email, Neri offers therein the 5th reason why he believes that I owe him $600,000.00.  He also confirms his belief that he has terminated CTI, removed me as a Director and Officer and even though I am a shareholder, essentially forbids his involvement with CTL, which ends with a threat that if he does not just go away with nothing, he will sue him.

[15]   To the extent the Buy-Sell has not been triggered by anyone, the TRO is necessary to preserve the status quo, *e.g.*, the value of the Company and its Good will, so that right will not be rendered illusory, not to mention preventing the reduction in value of my stock in general.

of the Buy-Sell, upon which I file this suit for Breach of Contract for the same.  Invariably, I made Neri aware of my position in these regards, and as a shareholder, requested that Neri provide him with access to the Company's financials.  Neri responded by stating the same were available for his personal inspection in Mexico, which access would apply for any subsequent request.  All of the Company's financials are computerized and fully available digitally.  Although he has since sent a balance sheet and P&L, they are through April, which I had previously and provide no back up.  I re-urged my request. Upon information and belief, Neri has boasted to others that he has no intention of buying my shares, and, to date, he has failed and refused to buy, close and continues operating CTL in violation of the Buy Sell.   In this regard, in order to protect the Buy-Sell rights of the shareholders, when a Deadlock is reached, it should presume or mean that the Company's status quo will be preserved, versus what Neri has done, to include but not limited to firing CTI without authority, removing me as Director (ostensibly as an Officer as well), refused to provide me with financial access,  proceeded down an operationally destructive path, which, in addition to what has been stated thus far herein and what is set out in e(i-xx) in he petition,  supports my claim that Neri breached his fiduciary duties to the Company and my  request for a TRO and Temporary Injunction, and to restore and preserve the status quo prior to Neri's actions, otherwise, the Company's value will be destroyed, un-repairable, and the Buy-Sell rights will be rendered illusory.

11.    Further, although the firing of CTI was reserved by the Company as an exclusive act of CTL's Board of Directors, no Board of Directors meeting was held for that purpose, nor to remove me as an officer of the Company, although Neri states I am longer an officer.[16]   To the contrary, both the firing of CTI and, ostensibly, the removal of me as an officer, although no mention is made of the same in the shareholder meeting minutes, were performed at a shareholders' meeting on April 16, 2021, in which Neri, asserting his majority, terminated CTI by voting to ratify his illegal individual and unilateral decision back in March 2021 to fire CTI, for which he had no authority rendering such act void as a result, and not subject to being ratified, versus holding a subsequent Board of Directors meeting and properly firing CTI and voting Neri to all the officer positions.  Since that time, Neri has taken several actions that he clearly knows are objectionable

---

[16]  Practically, I have been shut out of all matters pertaining to the Company, to include its financials, emails, contacts, and communication.  Accordingly, he is precluded from performing in any capacity to include the assertion of his rights as a shareholder.

to me, yet he has taken the same without conducting any corporate shareholders' meeting. Those actions are generally described in the petition, and listed as items e(i-xx) and incorporated herein by reference. He has, likewise, refused to allow me access to the Company in all respects and, to that end, has taken a previously valid corporation and turned into his own personal tool, and, otherwise, a sham corporation, also supporting a Deadlock on a fundamental matter.

12. "All documents referenced in and attached to Plaintiff's Original Petition and Application for Temporary Restraining Order and Injunctive Relief are true and correct copies of the documents that they purport to be, as stated herein. In addition, I have read Plaintiff's Original Petition and Application for Temporary Restraining Order and Injunctive Relief, and every assertion of fact therein stated by and/or attributed to me is within my personal knowledge and is true and correct, or as has been stated is based on my information and belief."

13. "It is further my testimony that immediate and irreparable injury, loss, or damage will result to the Company and myself before a hearing can be held on Plaintiff's application for a temporary injunction. More specifically, unless Defendant is immediately restrained as set forth below, the Company will be irreparably harmed if the unilateral acts of Defendant, Eduardo Neri, as enumerated in items e.(i) through e.(xx) set forth in Plaintiff's Original Petition and Application for Temporary Restraining Order and Injunctive Relief are not enjoined, to include granting digital access to the Company's books and records to me, to include access to its financial records and generally access to the same information as I previously enjoyed prior to being shut out. To preserve the value of the Company, the Company's status prior to March 22, 2021 in terms of the make-up, number, and membership of the its board of directors, its officers, and CTI as its manager must be restored, otherwise, the Company's value, and the Buy-Sell rights of the shareholders under the Buy-Sell Agreement, and its assets are at risk, the Buy-Sell Agreement will be frustrated and rendered illusory, along with the Buy-Sell rights of the parties therein, all resulting in irreparable harm to myself and the Company, for which neither has an adequate remedy at law. Based on the facts and documents set forth herein, I believe that the Plaintiff has a likelihood of success. As necessary, I further testify that:

1.    unless this restraint is ordered immediately, Plaintiff will suffer irreparable injury immediately, because no other legal remedy can be obtained and effected before the injury occurs;

2.    Plaintiff has no adequate remedy at law and is likely to succeed in this matter;

3.   Plaintiff has exercised due diligence and good faith before prosecuting the underlying claims in this cause;

4.   Plaintiff's injury will outweigh any injury to Defendant that may occur on issuance of this restraining order;

5.   The restraining order will not disserve the public interest; and

6.   The status quo prior to March 22, 2021, should be restored and maintained, which will preserve the rights and position of the shareholders, so their rights in the Buy-Sell and the corresponding deadlock will be preserved and the value of the Company protected."

_____
Alexios Vardoulakis, Individually,
and on behalf of Caribe Tankers, Ltd.

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, on this the
28th day of May, 2021, to certify my hand and seal of office.

_____
Notary Public, In and For
The State of Texas

TIFFANY CARROLL
My Notary ID # 128373810
Expires August 31, 2022

### First Amended Buy-Sell Agreement

This First Amended Buy-Sell Agreement (the **"Agreement"**), dated as of December 14, 2015_____, is by and between Eduardo Neri ("Neri"), and Alexios Vardoulakis ("Vardoulakis") (Neri and Vardoulakis hereinafter individually referred to as **"Shareholder"** and collectively referred to as the **"Shareholders"** or the **"Parties"**), and Caribe Tankers LTD, a Marshall Islands ltd (the **"Company"**),

WHEREAS, the Shareholders are the sole shareholders of the Company; and

WHEREAS, the Company currently has 80 issued and outstanding shares of stock (the "Stock"), and this Agreement shall apply to all of the Company's Stock;

WHEREAS, Neri currently owns fifty-six (56) shares of Stock and Vardoulakis owns twenty-four (24) shares of Stock;

WHEREAS, the Shareholders and Company wish to enter into this Agreement to provide buy-sell rights to each Shareholder and\or the Company upon the terms and conditions hereinafter set forth; and

WHEREAS, this Agreement amends and supersedes any and all other Buy-Sell Agreement(s) previously entered into by the Shareholders.

NOW, THEREFORE, the parties hereto agree as follows:

### ARTICLE I

1.     **Restrictions on Transferability of Stock.**   No Shareholder may sell, alienate, donate (by act inter vivos or mortis causa), bequeath, pledge, mortgage, encumber, assign, share, or otherwise transfer all or any part of his Stock in the Company except as provided in this Agreement. At the closing of any Stock transfer, the selling Shareholder (the "Selling Shareholder") shall deliver to the purchasing Shareholder or the Company, as the case may be, (collectively, the "Purchasing Shareholder") good and marketable title to his Stock, free and clear of all liens and encumbrances. Each Shareholder agrees to cooperate and take all actions and execute all documents reasonably necessary or appropriate to reflect the purchase of the Selling Shareholder's Stock by the Purchasing Shareholder. No Stock shall be transferred to a spouse in satisfaction of any property settlement.   A purported transfer of the Stock that is in violation of any of the aforementioned restrictions on transferability shall be invalid and ineffective.



1

**EXHIBIT A**

## ARTICLE II

2.     **Deadlock**. If the Shareholders are unable to agree on any of the **Fundamental Matters,** defined below, and such disagreement continues for thirty (30) days despite good faith deliberations by the Shareholders ("**Deadlock**") or if the Shareholders agree in writing that they desire to buy or sell, as the case may be, the other's Stock, then either Shareholder shall be entitled to exercise the buy-sell rights set forth in this Article by delivering a Buy-Sell Offer Notice (as defined herein). Notwithstanding the above, this Article II shall not be applicable during the period of a pending Transferability of Stock as provided in Article III below.

2.1     **Fundamental Matters**. For purposes hereof, "**Fundamental Matters**" shall mean any of the following matters:

(a)     Amend the Company's Articles of Incorporation documents;

(b)     Make any material change to the nature of the current business conducted by the Company or enter into any business other than the business currently conducted by the Company;

(c)     Adopt or amend the Budget, if any;

(d)     Issue additional Stock or admit additional Shareholders to the Company;

(e)     Incur any indebtedness in excess of USD $100,000.00 in a single transaction or series of related transactions, or in excess of USD $100,000.00 in the aggregate at any time outstanding;

(f)     Make any loan in excess of USD $100,000.00;

(g)     Appoint or remove the Company's auditors or make any changes in the accounting methods or policies of the Company;

(h)     Enter into or effect any transaction or series of related transactions involving the purchase, lease, license, exchange or other acquisition (including by merger, consolidation, acquisition of stock or acquisition of assets) by the Company of any assets and/or equity interests of any entity or person, other than in the ordinary course of business consistent with past practice;

(i)     Enter into or effect any transaction or series of related transactions involving the sale, lease, license, exchange or other disposition (including

2



by merger, consolidation, sale of stock or sale of assets) by the Company of any assets, other than sales of inventory in the ordinary course of business consistent with past practice;

(j)     Settle any lawsuit, action, dispute or other proceeding or otherwise assume any liability with a value in excess of USD $100,000.00 or agree to the provision of any equitable relief by the Company;

(k)     Make any investments in any other entity or person in excess of USD $100,000.00; or

(l)     Dissolve, wind-up or liquidate the Company or initiate a bankruptcy proceeding involving the Company.

2.2     **Buy-Sell Offer Notice**. If a Shareholder wishes to exercise the buy-sell right provided in this Article, such Shareholder (the "**Initiating Shareholder**") shall deliver to the other Shareholder (the "**Responding Shareholder**") written notice (the "**Buy-Sell Offer Notice**") of such election, which notice shall include (a) a description of the circumstances that triggered the buy-sell right, and (b) the purchase price on a per share basis (which shall be payable exclusively in cash (unless otherwise agreed)) at which price the Initiating Shareholder shall (i) purchase all of the Stock owned by the Responding Shareholder (the "**Buy-out Price**") or (ii) sell all of his Stock to the Responding Shareholder (the "**Sell-out Price**"), with any difference between the Buy-out Price and the Sell-out Price based solely on the number of shares owned by the "selling" Shareholder multiplied by the per share price set forth in (b) above.

2.3     **Response Notice**. Within thirty (30) days after the Buy-Sell Offer Notice is received (the "**Buy-Sell Election Date**"), the Responding Shareholder shall deliver to the Initiating Shareholder a written notice (the "**Response Notice**") stating whether he elects to (a) sell all his Stock to the Initiating Shareholder for the Buy-out Price or (b) buy all of the Stock owned by the Initiating Shareholder for the Sell-out Price. The failure of the Responding Shareholder to deliver the Response Notice by the Buy-Sell Election Date shall be deemed to be an election to sell all of his Stock to the Initiating Shareholder at the Buy-out Price.

2.4     **Closing**. The closing of any purchase and sale of Stock pursuant to this Agreement shall take place thirty (30) days after the Response Notice is delivered or deemed to have been delivered or some other date mutually agreed upon by the parties. The Buy-out Price or the Sell-out Price, as the case may be, shall be paid at closing by wire transfer of immediately available funds to an account designated in writing by the Selling Shareholder.



3

## ARTICLE III

### 3.  Transferability of Stock – Non-Deadlock Situations.

3.1    Prohibition of **Sale to Third Parties**.

       **3.1.1. Shareholder Consent.** The Shareholders agree that the Stock of any Shareholder may not be sold or otherwise transferred to a third party without the express written consent of all of the non-selling Shareholders, which consent may be withheld for any reason whatsoever, whether reasonable or otherwise.

3.2    **Death of Shareholder.**

       **3.2.1   Option to Purchase Deceased Shareholder's Interest.**   In the event of a Shareholder's death, the Company first, and then the remaining Shareholders shall have the option to purchase all or any part of the deceased Shareholder's Stock in the Company, including the undivided community property or separate property, if any, interest of the surviving spouse ("Deceased Shareholder's Interest"), for the Fair Market Value, as determined in accordance with Section 3.4.

       **3.2.2   Exercise of Option.**   The Company initially shall have the option to purchase for Fair Market Value as determined in accordance with Section 3.4 hereof, all or any part of the Deceased Shareholder's Stock for a period of ninety (90) days ("Company's Death Option Period") after the Company receives notice of the date of death of the Shareholder (the "Death Date").   If the Company elects not to exercise its option to purchase the Deceased Shareholder's Stock, each of the remaining Shareholders shall have the option to purchase all or any part of the Deceased Shareholder's Stock for Fair Market Value as determined in accordance with Section 3.4.   Such option to purchase (the "Shareholders' Death Option to Purchase") shall begin upon the earlier of the expiration of the Company's option to purchase or after notification by the Company that it declines to exercise its option to purchase the Deceased Shareholder's Stock and shall terminate sixty (60) days thereafter ("Shareholder's Death Option Period").   If more than one Shareholder elects to purchase the Deceased Shareholder's Stock, the Stock shall be divided between the electing Shareholders in any manner in which they may all agree, and if there is no agreement between all the electing Shareholders, then the Stock shall be divided between the electing Shareholders in proportion to their respective Stock ownership in the Company as of the date of death of the Deceased Shareholder.



4

3.2.3 **Failure to Exercise Option to Purchase.** If the Deceased Shareholder's Stock is not purchased by one of the above parties pursuant to Sections 3.2.1 and 3.2.2 above, the Deceased Shareholder's surviving spouse, estate, heirs, successors, devises, executor or administrator shall become the owner of the Stock but only after the execution of this Agreement.

3.2.4 **Key Man Insurance.** Notwithstanding anything herein to the contrary, the Company may purchase Key Man Life Insurance insuring the lives of the Shareholders. If such insurance is in force at the time of the death of a Shareholder, then this paragraph shall govern the purchase of the deceased Shareholder's Stock. The Company's Shareholders shall agree on the value of the Company as of the date of this Agreement and every three (3) years thereafter by completing and executing the Declaration of Intent, a copy of which is attached hereto as Schedule A. The Company, if it elects to purchase Key Man Insurance, shall purchase such insurance to cover the value of each Shareholder's Stock as determined by the Declaration of Intent. Within thirty (30) days of receipt of notice of the death of a Shareholder, the Company shall notify the life insurance company of the Shareholder's death and seek payment of the policy's death benefit. Within sixty (60) days of receipt of the insurance proceeds, the Company shall pay to the deceased Shareholder's estate the sum of the deceased Shareholder's Stock value, as represented by the most recently, timely completed Declaration of Intent. If the insurance proceeds received by the Company are not sufficient to purchase all of the deceased Shareholder's Stock, then the Company shall purchase as much Stock on a per share basis as it can with the received insurance proceeds. The remaining shares of the deceased Shareholder's Stock may be purchased in accordance with Section 3.2.1 and 3.2.2.

3.3     **Divorce of Shareholder.**

3.3.1 **Acknowledgement of Postnuptial Agreement.** The Shareholder and his/her spouse acknowledge the existence of a postnuptial agreement, which identifies the Shareholder's interest in the Company as the Shareholder's separate property.

3.3.2 **Obligation to Acquire Former Spouse's Interest.** Accordingly, in the event a Shareholder files a petition for divorce, is served with one or accepts service of one filed by a spouse, the Shareholder (the "Divorced Shareholder") shall be obligated to obtain, and the spouse will be obligated to provide, the full release of any claims of his or her former spouse ("Former Spouse") to any and all of the Stock in the Company (the "Release of Ownership Claims").



5

## ARTICLE IV

4.      Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder (each, a "**Notice**") shall be in writing and addressed to the parties at their addresses set forth on **Schedule B** attached hereto (or to such other address that may be designated by the receiving party from time to time in accordance with this Section). All Notices shall be delivered by a personal delivery, nationally recognized overnight courier (with all fees prepaid), facsimile or e-mail of a PDF document (with confirmation of transmission) or certified or registered mail (in each case, return receipt requested, postage prepaid). Except as otherwise provided in this Agreement, a Notice is effective only (a) upon receipt by the receiving party, and (b) if the party giving Notice has complied with the requirements of this Section.

5.      Entire Agreement. This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

6.      Successor and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. No party may assign any of its rights or obligations hereunder without the prior written consent of the other parties hereto, which consent shall not be unreasonably withheld or delayed. No assignment shall relieve the assigning party of any of its obligations hereunder.

7.      No Third-party Beneficiaries. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

8.      Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

9.      Amendment and Modification; Waiver. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

10.     **Severability.**  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

11.     **Governing Law; Submission to Jurisdiction.** This Agreement shall be governed by and construed in accordance with the internal laws of the State of Texas. Any legal suit, action or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal or state courts located in the city of Houston, Texas, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. Service of process, summons, notice or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

12.     **Waiver of Jury Trial.** Each party acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby. Each party to this Agreement certifies and acknowledges that (a) no representative of any other party has represented, expressly or otherwise, that such other party would not seek to enforce the foregoing waiver in the event of a legal action, (b) such party has considered the implications of this waiver, (c) such party makes this waiver voluntarily, and (d) such party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 11.

13.     **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

14.     **Stock Legend.** Each certificate of Stock shall bear a legend substantially in the following form:

7

2259778-1

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A BUY-SELL AGREEMENT AMONG THE COMPANY AND ITS SHAREHODLERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE SHARES REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH BUY-SELL AGREEMENT.

15.     **Spousal Consent.** Each and every Shareholder's spouse shall execute the Spousal Consent attached hereto as Exhibit C.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

Caribe Tankers LTD

By  ALEXIOS V ARDOULAKIS
Its: DIRECTOR, TREASURER, SECRETARY

By _____
Eduardo Neri, Individually

By _____
Alexios Vardoulakis, Individually

8

2259778-1

## SCHEDULE A

### DECLARATION OF INTENT

The Shareholders of Caribe Tankers LTD (the "Company") hereby declare as follows:

(a)     In accordance with Section 3.2.4 of that certain Buy-Sell Agreement dated as of the 25 th day of MAR , 2014, the undersigned agree that as of the 14 day of DEC , 20 2015, the current Fair Market Value of Caribe Tankers LTD is FOUR MILLION DOLLARS ($4,000,000.000);

(b)     Upon the death of a Shareholder (the "Deceased Shareholder"), the remaining Shareholder(s) shall cause the Company to purchase the Deceased Shareholder's Stock in the Company for the Deceased Shareholder's pro-rata share of the above total corporate value, but only to the extent the Company receives sufficient proceeds from any life insurance policy(ies) purchased by the Company and insuring the life of the Deceased Shareholder to cover such cost or that amount of Stock as provided in Article III, Section 3.2.4.

SHAREHOLDERS:

_____
Eduardo Neri

_____
Alexios Vardoulakis

## SCHEDULE B

### SHAREHOLDER ADDRESSES

Eduardo Neri

Miguel Aleman no 82 oficina 23
Boca del Rio  Veracruz, Mexico  94290

Alexios Vardoulakis

2202-D West Alabama St Houston TX, 77098

Caribe Tankers, LTD

Trust Company Complex
Ajaltake Road
Ajaltake Island, Majuro  MH 96960

**EXHIBIT C**

**SPOUSAL CONSENT**

The undersigned, being the spouse of  Alexios Vardalakis , a Company Shareholder who executed the Buy-Sell Agreement of Caribe Tankers, LTD, (the "Company"), hereunto subscribes his or her name in evidence of his or her individual agreement and consent to the Buy-Sell Agreement ("Agreement"), effective  April 25, 2014.  The undersigned consents to the provisions of the Agreement, but such consent does not render the spouse a Shareholder in the Company for any purpose. The undersigned also represents that he or she has read and does hereby approve of all of the provisions of the Agreement and agrees to be bound by and accept the terms of such Agreement in lieu of all other interests that he or she may have in the Company, if any, including but not limited to those terms set forth in Article III of the Agreement.  The undersigned has executed the Agreement for the limited purpose of consenting to the manner in which his or her respective community or separate property interests (if any) in the Company will be disposed of and accordingly, the undersigned agrees that he or she will not be or be deemed to be a Shareholder in the Company. The undersigned further agrees that his or her signature will never be required on any further amendment of the Agreement.   (Unless there is a change in the manner in which the undersigned's respective community or separate property interests (if any) in the Company is or will be changed.)

The undersigned acknowledges that the Agreement has been translated from English to Spanish or Greek, as the undersigned requested, and confirms that he or she understands the contents of the Agreement.

(Signature)

LELIPOU CHRISTINA
(Printed Name)

Date Signed:  14 DEC 2015

2259778-1

**EXHIBIT C**

**SPOUSAL CONSENT**

The undersigned, being the spouse of _____, a Company Shareholder who executed the Buy-Sell Agreement of Caribe Tankers, LTD, (the "Company"), hereunto subscribes his or her name in evidence of his or her individual agreement and consent to the Buy-Sell Agreement ("Agreement"), effective April 25, 2014. The undersigned consents to the provisions of the Agreement, but such consent does not render the spouse a Shareholder in the Company for any purpose. The undersigned also represents that he or she has read and does hereby approve of all of the provisions of the Agreement and agrees to be bound by and accept the terms of such Agreement in lieu of all other interests that he or she may have in the Company, if any, including but not limited to those terms set forth in Article III of the Agreement. The undersigned has executed the Agreement for the limited purpose of consenting to the manner in which his or her respective community or separate property interests (if any) in the Company will be disposed of and accordingly, the undersigned agrees that he or she will not be or be deemed to be a Shareholder in the Company. The undersigned further agrees that his or her signature will never be required on any further amendment of the Agreement. (Unless there is a change in the manner in which the undersigned's respective community or separate property interests (if any) in the Company is or will be changed.)

The undersigned acknowledges that the Agreement has been translated from English to Spanish or Greek, as the undersigned requested, and confirms that he or she understands the contents of the Agreement.


_____
(Signature)


_____
(Printed Name)

Date Signed: _____

# SUBSCRIPTION AGREEMENT

This Subscription Agreement (the "Agreement") is entered into effective as of the 1 day of _Jan_____, 2016 by and between Eduardo Neri ("Eduardo"), and Alex Vardoulakis ("Alex"), with respect to three corporations to be formed under the Marshall Islands Business Corporations Act (Marshall Islands Revised Code 2004), or at a place of incorporation as otherwise mutually agreed, as amended, modified, superseded or replaced from time to time (the "Corporation Act").

WHEREAS

     I.     Through a series of transactions (the "Sale and Charter Transactions"), three vessels previously owned by Caribe Tankers, Ltd., a Marshall Islands corporation ("CTL") have been sold to Parchem III TT A/S, a Norwegian company (the "Owner") and bareboat chartered from Owner to CTL, such vessels being the Liberia flag vessel CARIBE CRISTINA (ex HARBOUR KRYSTAL), IMO Number 9330020 (the "Cristina"), the Liberia flag vessel CARIBE MARIA (ex HARBOUR KIRA), IMO Number 9337286 (the "Maria"), and the Liberia flag vessel CARIBE ILSE (ex HARBOUR KRISTIN), IMO Number 9322982 (the "Ilse"), such vessels being referred to herein individually as a "Vessel" and collectively as the "Vessels";

     II.     CTL is jointly owned by Alex and Eduardo, with Alex owning 30% of the issued and outstanding shares of capital stock of CTL and Eduardo owning 70% of the issued and outstanding shares of CTL;

     III.     As an integral part of the Sale and Charter Transactions, and in addition to transferring the Vessels to Owner pursuant to that certain Memorandum of Agreement dated December 18, 2015, between CTL and Owner (i) CTL made a cash payment in the amount of US$3,412,500.00 to Owner, (ii) Anchor Maritime Investments S.A., a company formed under the laws of Luxembourg ("AMI"), 50% of the issued and outstanding equity interests of which are owned by Alex and Eduardo, received a 10% equity interest in the Owner, (iii) CTL and Owner entered into three bareboat charters, one for each of the vessels (each a "Charter" and collectively the "Charters"), (iv) pursuant to each Charter CTL received (x) an option to purchase (the "Purchase Option"), (y) an obligation to purchase (the "Purchase Obligation"), and also received a Charterer's Credit (as such term is defined in each of the Charters) in the amount of $3,412,500.00 which may be credited, in whole or in part, against the purchase price for the Vessels upon the terms described in the Charters and the Charterers Credit Agreement dated 18 December 2015 (the "Credit Agreement") between CTL and Owner; and (v) CTL borrowed US$1,130,000.00 from Empresa Maritima Americana Ltd., a company owned by Eduardo;

     IV.     Individually, and as beneficial owners of CTL, and as a part of the Sale and Charter Transactions, Eduardo and Alex have agreed that (i) in the event that the Vessels are purchased pursuant to the Purchase Option, or the Purchase Obligation, each Vessel will be purchased by a corporation to be formed under the Corporation Act and pursuant to this Agreement (individually "Newco" and collectively "Newcos", and (ii) whether or not any Vessel is purchased by Newco or Newcos, (x) Alex shall issue to Eduardo a promissory note (the "Note") in the original principal amount of US$600,000.00, payable in six equal annual

EXHIBIT B

installments, or as otherwise mutually agreed by Alex and Eduardo, and upon the other terms described in the form of note attached hereto as Exhibit A and incorporated herein by reference, and (y) as between themselves Eduardo and Alex will treat their fifty percent ownership interest in AMI as being owned 50% by Alex and 50% by Eduardo;

NOW THEREFORE, in consideration of the benefits to themselves individually and to the entities they beneficially own as a result of the Sale and Charter Transactions, and in further consideration of the mutual agreements hereinafter contained, Eduardo and Alex agree as follows:

ARTICLE 1
STOCK SUBSCRIPTION

Section 1.01   NEWCO FORMATION TERMS

Prior to exercise of the Purchase Option and prior to purchase of the Vessels pursuant to the Purchase Obligation, the following actions will be taken with respect to each Vessel being purchased:

(a) a Newco will be formed for each Vessel with 1,000 shares of authorized common stock (the "Common Stock"), par value US$1.00 per share, and otherwise pursuant to the Articles of Incorporation attached hereto as Exhibit B, and the Bylaws attached hereto as Exhibit C, each of which is incorporated herein by reference.

(b) The rights and obligations under the Purchase Option, and the Purchase Obligation, under each Charter and the Credit Agreement with respect to each Vessel will be assigned from CTL to the Newco or Newcos, as appropriate, that will own such Vessel pursuant to the form of Assignment attached hereto as Exhibit D and incorporated herein by reference.

Section 1.02   STOCK SUBSCRIPTION

Each of Alex and Eduardo (each a "Purchaser" and collectively the "Purchasers") hereby subscribes for Five Hundred (500) shares of the Common Stock of each Newco and agrees to pay to each such company US$1.00 per share, or such greater amount that is agreed between them at the time, within ten (10) days, or as otherwise mutually agreed by Alex and Eduardo, after formation of the applicable Newco as consideration for the issuance of such shares. The foregoing subscription for Common Stock shall be irrevocable until such time as the rights and obligations under the Purchase Option, and the Purchase Obligation have expired. The Purchaser is acquiring the Security solely for the Purchaser's own account and not with a view to its distribution within the meaning of the Securities Act of 1933 and the Rules and Regulations thereunder (collectively, the "Act").

Section 1.03   ISSUANCE OF COMMON STOCK CERTIFICATES

Upon receipt of the full amount of consideration due from a Purchaser, the parties shall cause the Newco that received such consideration from a Purchaser to issue to such Purchaser a certificate representing the shares of Common Stock purchased.

Section 1.04   PURCHASER REPRESENTATIONS REGARDING COMMON STOCK

Each Purchaser represents that such Purchaser's present and anticipated financial position permits the Purchaser to purchase such Common Stock and to hold such Common Stock indefinitely for investment purposes. Each Purchaser acknowledges that:

(a)      the availability of the exemption from registration under the Act that will be relied upon by each Newco in issuing the Common Stock is dependent, in part, upon the truth of the representations made herein;

(b)      each Purchaser is thoroughly familiar with the proposed business of each Newco and has made all investigations which such Purchaser deems necessary or desirable;

(c)      the Common Stock will not be registered under the Act, under any applicable state securities law or other law with respect to issuance of securities and must be held indefinitely unless it is subsequently so registered or unless an exemption from such registration is available;

(d)      each Newco will be under no obligation to register the Common Stock under any circumstances or to attempt to make available any exemption from registration under the Act or any applicable state securities law or other law applicable to registration of securities, at Purchaser's expense or otherwise;

(e)      each certificate representing the Common Stock will bear the following legend, or one similar thereto, drawing attention to the restrictions on its transferability;

> THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER ANY APPLICABLE STATE SECURITIES LAW. THESE SECURITIES MAY NOT BE TRANSFERRED EXCEPT UPON DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY IN FORM AND SUBSTANCE TO THE COMPANY THAT SUCH TRANSFER WILL NOT VIOLATE THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY APPLICABLE STATE SECURITIES LAW.

(f)      if, at a time when registration is required, it is legally permissible for the Purchaser to sell the Common Stock owned by such Purchaser privately without registration, and Common Stock so sold will be restricted in the hands of the purchaser.

**ARTICLE 2**
**NOTE**

Section 2.01   ISSUANCE OF NOTE

Alex agrees to immediately execute the Note and deliver the original to Eduardo.

**ARTICLE 3**
**OWNERSHIP OF AMI**

Section 3.01   EQUAL OWNERSHIP OF AMI

As between Eduardo and Alex, they agree to treat the current fifty percent (50%) ownership interest that they collectively own in AMI as being owned fifty percent (50%) by Alex and fifty percent (50%) by Eduardo, i.e as if they each own twenty five percent (25%) of AMI.

Section 3.02   PAYMENT OBLIGATIONS

In the event that any payment is received by Alex or Eduardo with respect to their ownership interest in AMI, the party receiving the payment agrees to immediately pay to the other party the portion of such payment that proportionately exceeds the interest of the receiving party described in Section 3.01.

**ARTICLE 4**
**OTHER PROVISIONS**

Section 4.01   THIRD PARTIES

Nothing in this Agreement, express or implied, is intended to confer on any person or entity any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 4.02   NOTICES

Any notice or other communication required or permitted hereunder shall be in writing and shall be delivered by (i) personal delivery, (ii) expedited delivery service, (iii) certified or registered mail, postage prepaid, or (iv) by email. Any such notice shall be deemed given upon its receipt at the following address (or, in the case of email, upon confirmation of receipt):

If to Alex:       Alex Vardoulakis
                  c/o Caribe Tankers, Inc.
                  2202 W. Alabama Street
                  Houston, Texas 77098
                  Email: alexios_v@me.com

4

If to Eduardo:  Eduardo Neri
                Lomas De San Pero 4 Alvarado
                Veracruz 97264 Mexico
                Email: eneri@mapalogistics.com

Any party may, by notice given in accordance with this Section to the other party, designate another address for receipt of notices hereunder.

Section 4.03   ENTIRE AGREEMENT

This Agreement (a) constitutes the entire agreement among the parties relating to the subject matter hereof and (b) supersedes all previous understandings and agreements among the parties relating to the subject matter hereof, both written or oral.

Section 4.04   ASSIGNMENT

No party to this Agreement may assign its rights or delegate its obligations hereunder without the prior written consent of each other party. Any attempted assignment without prior written consent will be void ab initio. Subject to the preceding two sentences, this Agreement will be binding on and inure to the benefit of the parties and their respective successors and assigns.

Section 4.05   TERMINATION

This Agreement terminates upon the occurrence of any of the following events:

(i)     the written agreement of the parties to terminate this Agreement; or

(ii)    the expiration of the rights and obligations under the Purchase Option, and the Purchase Obligation.

Such termination shall not affect any rights that have accrued to a party prior to such termination, except as agreed in writing by the parties

Section 4.06   COUNTERPARTS

This Agreement may be signed in multiple counterparts, each of which will be considered an original but all of which together constitute one and the same instrument, and in making proof of this Agreement it is not be necessary to produce or account for more than one counterpart.

[Remainder of Page Blank]

In Witness Whereof, the parties have signed this Agreement to be effective as of the date first above written.

_____
Eduardo Neri

_____
Alex Vardoulakis

## UNSECURED PROMISSORY NOTE

Date:                           JAN 4 , 2016

Maker:                         Alex Vardoulakis

Maker's Mailing Address:     2202 W. Alabama Street
Houston, Texas 77098
Harris County, Texas

Lender:                       Eduardo Neri

Place for Payment:          Lomas De San Pero 4 Alvarado
Veracruz 97264 Mexico

Principal Amount:           Six Hundred Thousand U.S. Dollars
(USD 600,000.00)

Annual Interest Rate:         Zero Percent (0%)

Maturity Date:              May 1, 2021

Annual Interest Rate on Matured,
Unpaid Amounts:            Ten Percent (10%)

Terms of Payment (principal and
interest):                 The Principal Amount is due and payable in six equal annual installments of One Hundred Thousand U.S. Dollars (US$100,000.00) each, with the first such payment due and payable on May 1, 2016, and with the subsequent annual payments due and payable on May 1 of 2017, 2018, 2019, 2020, and 2021, or as otherwise mutually agreed between Alex and Eduardo. Interest on the unpaid principal balance is due and payable annually as it accrues, on the same dates as and in addition to the installments of principal. Payments will be applied first to accrued interest and the remainder to reduction of the Principal Amount.

Security for Payment:        None.

Other Security for Payment:    None.

## Article 1
### PROMISE TO PAY

Maker promises to pay to the order of Lender the Principal Amount plus interest at the Annual Interest Rate.  This note is payable at the Place for Payment and according to the Terms of Payment.  All unpaid amounts are due by the Maturity Date.  If any amount is not paid either when due under the Terms of Payment or on acceleration of maturity, Maker promises to pay any unpaid amount plus interest from the date the payment was due to the date of payment at the Annual Interest Rate on Matured, Unpaid Amounts.

## Article 2
### DEFAULTS AND REMEDIES

If Maker defaults in the payment of this note or in the performance of any obligation in any instrument securing or collateral to this note, Lender may declare the unpaid principal balance, earned interest, and any other amounts owed on the note immediately due.

## Article 3
### WAIVERS

Maker and each surety, endorser, and guarantor waive, to the extent permitted by law, all (1) demand for payment, (2) presentation for payment, (3) notice of intention to accelerate maturity, (4) notice of acceleration of maturity, (5) protest, and (6) notice of protest.

## Article 4
### ATTORNEY'S FEES

Maker also promises to pay reasonable attorney's fees and court and other costs if this note is placed in the hands of an attorney to collect or enforce the note. These expenses will bear interest from the date of advance at the Annual Interest Rate on Matured, Unpaid Amounts.  Maker will pay Lender these expenses and interest on demand at the Place for Payment. These expenses and interest will become part of the debt evidenced by the note and will be secured by any security for payment.

## Article 5
### PREPAYMENT

Maker may prepay this note at any time before the Maturity Date without penalty or premium.

## Article 6
### USURY SAVINGS

Interest on the debt evidenced by this note will not exceed the maximum rate or amount of non-usurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the Principal Amount or, if the Principal Amount has been paid, refunded.  On any acceleration or required or permitted prepayment, any excess interest will be canceled automatically as of the acceleration or prepayment or, if the excess interest has already been paid, credited on the Principal Amount or,

if the Principal Amount has been paid, refunded.   This provision overrides any conflicting provisions in this note and all other instruments concerning the debt.

## Article 7
### CHOICE OF LAW

This note will be governed by and construed under the laws of the State of Texas, without regard to choice-of-law rules of any jurisdiction.

## Article 8
### OTHER CLAUSES

When the context requires, singular nouns and pronouns include the plural.

INTENDING TO BE LEGALLY BOUND, the Maker has signed this note to be effective the date first above written.

Alex Vardoulakis

3

Caribe Tankers Mail - CTL                                                              5/17/21, 3:30 PM

 **CARIBE TANKERS INC**                    Alex Vardoulakis <alex@caribetankers.us>

## CTL

1 message

**Alex Vardoulakis** <alex@caribetankers.us>                        Mon, Mar 22, 2021 at 4:01 PM
To: Eduardo Neri <eneri@mapalogistics.com>
Cc: Dimitris Georgantas <Dimitri.Georgantas@roystonlaw.com>
Bcc: Alex Vardoulakis <alex@caribetankers.us>, Yofis Florentin <yofis@caribetankers.us>, Bijan Taghavi
<admin@contractcfo.net>

Eduardo,

I am writing to provide the attached Memorandum for the Record, detailing CTL's current financial condition, and a
realistic projection of the future if we do not drastically change course. Staying the course as we have been, and you
seem to suggest, will without a doubt cause CTL to collapse and will be looked at as completely negligent by our
creditors. CTL will most certainly fail and related parties, vendors and suppliers will get hurt. To date, your solution has
been to delay and postpone, using our customer's advice/guidance as the main excuse. I ask you once again to meet
with me and be prepared to face and discuss the facts. I have an approach that may very well save CTL, but it needs
to be executed immediately. If you choose not to engage with me, I will do all within my power to proceed
nevertheless.

Dimitri Georgantas will be copied on this and all future communications, regarding this matter, as CTL's attorney.

I have genuine affection for you Eduardo, your family (this is our baby & our family) and I am hopeful that we can align
with one another in service of CTL's and our customers' best interests.

Yours,

Alexios Vardoulakis
Caribe Tankers Inc
As Managers for and on Behalf of CARIBE TANKERS LTD

** I WILL BE WORKING FROM __HOUSTON__ FOR A WHILE BUT CONTACTABLE ON BOTH US & GREEK MOBILE **

**Tel:         +1 713 807 9900**
**Mob:        +1 713 382 3515**
Fax:          +1 713 807 9904
**Greek Mob: +30 698 0060691**

**Messaging**:
**I-Message/Viber/What's Up:** +1 713 382 3515
**Skype:** alexios_v

 **MEMORANDUM FOR THE RECORD.pdf**
46K

EXHIBIT C

MEMORANDUM FOR THE RECORD
RE: CARIBE TANKERS LTD FINANCIAL CONDITION

The purpose of this memorandum is to detail the current financial condition of CTL and project the future under current operational conditions:

- In 2020, the average usage of CMAR/CCRI is 10,000MT and CLIZ is 11,300MT
- In 2021, the average usage of CMAR/CCRI is 9,200MT, CLIZ is 10,800MT and ATLP is **13,500MT**

- In 2020, the average voyage duration was 11.40 days
- In 2021, the average voyage duration is 13.50 days

- As per 2020 data/trade, the net profit from March to July will be $750k
- As per 2021 data/trade, the net loss from March to July will be $1.8M
- If the ATLP is utilised as 12,500MT, the net profit from March to July will be $460k

- The new trade debt incurred in 2021 so far (incl. loans) is $1M
- Assuming the trade goes back to normal (2020 standards with higher volume), the estimated profit (ie $750k) will cover part of the new trade debt, thus leaving no funds for the DD of the CLIZ
- The minimum cash that should be available by July is $700k, thus there will be a shortage of $950k
- During DD, the Opex+Capex for the CLIZ will need to be covered, adding another $250k burden (950 + 250 = $1.2M)

Caribe Tankers Mail - RE: CTL                                                                                6/17/21, 3:34 PM

**CARIBE
TANKERS INC**

Alex Vardoulakis <alex@caribetankers.us>

RE: CTL
1 message

Eduardo Neri <eneri@mapalogistics.com>                           Mon, Mar 22, 2021 at 5:14 PM
To: Alex Vardoulakis <alex@caribetankers.us>
Cc: Dimitris Georgantas <Dimitri.Georgantas@roystonlaw.com>

Agreement attached


Rgds


---

**De:** Eduardo Neri
**Enviado el:** lunes, 22 de marzo de 2021 04:12 p. m.
**Para:** Alex Vardoulakis <alex@caribetankers.us>
**CC:** Dimitris Georgantas <Dimitri.Georgantas@roystonlaw.com>
**Asunto:** RE: CTL


Alex


As part of CTLs financial effort to reduce costs , hereby and on behalf of CTL we give to CTI 1 month cancelation
notice as per attached agreement


Effective termination date April 30th 2021


Kindly confirm receipt


Regards


---

**De:** Alex Vardoulakis <alex@caribetankers.us>
**Enviado el:** lunes, 22 de marzo de 2021 03:02 p. m.
**Para:** Eduardo Neri <eneri@mapalogistics.com>

EXHIBIT D

Caribe Tankers Mail - RE: CTL                                                                          5/17/21, 3:34 PM

**CC:** Dimitris Georgantas <Dimitri.Georgantas@roystonlaw.com>
**Asunto:** CTL

Eduardo,

I am writing to provide the attached Memorandum for the Record, detailing CTL's current financial condition, and a realistic projection of the future if we do not drastically change course. Staying the course as we have been, and you seem to suggest, will without a doubt cause CTL to collapse and will be looked at as completely negligent by our creditors. CTL will most certainly fail and related parties, vendors and suppliers will get hurt. To date, your solution has been to delay and postpone, using our customer's advice/guidance as the main excuse. I ask you once again to meet with me and be prepared to face and discuss the facts. I have an approach that may very well save CTL, but it needs to be executed immediately. If you choose not to engage with me, I will do all within my power to proceed nevertheless.

Dimitri Georgantas will be copied on this and all future communications, regarding this matter, as CTL's attorney.

I have genuine affection for you Eduardo, your family (this is our baby & our family) and I am hopeful that we can align with one another in service of CTL's and our customers' best interests.

Yours,

Alexios Vardoulakis

Caribe Tankers Inc

As Managers for and on Behalf of CARIBE TANKERS LTD


** I WILL BE WORKING FROM  HOUSTON  FOR A WHILE BUT CONTACTABLE ON BOTH US & GREEK MOBILE **


**Tel:**       **+1 713 807 9900**

**Mob:**      **+1 713 382 3515**

Fax:       +1 713 807 9904

**Greek Mob: +30 698 0060691**


**Messaging**:

**I-Message/Viber/What's Up:** +1 713 382 3515

**Skype:** alexios_v


📎 **Commercial Management Agmt Amendment dated 060412.pdf**
283K

May 3, 2021

Dear Eduardo

I have read your letter of April 23, 2021 carefully, and every time I do, I fail to see how it can be construed as anything other than an offer to purchase my shares of stock in Caribe Tankers, Ltd. ("CTL") under our buy sell agreement, no matter how hard your lawyers try to disclaim it.

Section 1 of your letter is nothing more than an offer to purchase my ownership interest in our business for the cancelation of a promissory note as a result of our deadlock and disputes as to our budget, indebtedness, manner of business operation and management of the company.

As we both know, I assert the promissory note was signed to evidence the funds I owed for equalizing our ownership in our business during 2016 when we elected to change our business plan to include vessel ownership, a decision that meant a significant increase in the burdens and responsibilities placed upon me. The amount of $425,000 was for payment for the 16 shares you were to transfer to me to make us 40 shares each in CTL, and $175,000 for payment of one half of the $350,000 deposit made on behalf of Maritima International to Anchor Maritime Investments, S.A., for our 5% combined interest in the Parchem 3 Project, an investment in the ownership of Caribe Cristina, Caribe Maria & Caribe Isle. Furthermore, as you are aware, this $175,000 was to equalize our deposit, which is to be repaid to us, if as and when dividends are paid.

You, by contrast, have changed your position four times as to what the promissory note is for. First, on April 12, 2021, you responded to my effort to pay the note and receive my shares with "Why would I need to give you anything for money that you owe me?" Then, the next day, in response to my questioning what it was for if not for the equalization of our ownership in our business, you changed your position, saying, "The promissory note, as per my recollection of event was for you to pay for the initial 24 shares CTL you got." Then on April 15, you simply said "The only understanding we had in 2016 was that you will pay me $600,000...." Then again, after I corrected you, by providing you with CTL's record of paid in capital showing I paid for 46% of the shares issued in 2009 but received only 20 shares, and later paid you $4000 in 2014 for 4 additional shares, thereby totaling payment for 47.5% of the outstanding shares, you stated "I already informed my lawyers for what the $600,000 was for, including the cash I gave you during your divorce." Despite my constant requests for proof of your position, you have provided none. You did however, further confirm my position by recognizing we equalized our ownership in our business by acknowledging our agreement in MAPA USA is 50/50.

**EXHIBIT E**

Accordingly, I do see your proposal as an offer to purchase my ownership in our business under our buy sell agreement. Giving you the benefit of the doubt, I will consider your offer of being $600,000 for 24 shares in CTL or $25,000 per share. I elect NOT to sell my shares, but instead, I elect to pay you $1.4 million, in cash, for your 56 shares.

Given, the sensitivity of the situation and your intentional excluding me from participation and knowledge of our business' daily activities, time is of the essence, as the offer is based upon today and not a worsened financial condition as a result of your unilateral actions.

Please provide me with your wiring instructions so that I can promptly initiate payment by wire transfer of immediately available funds pursuant to the buy sell agreement. I will let the lawyers prepare any required documents and instruments of transfer, which can be done at a later date, as has been our customary practice from the beginning.

Alex

CARIBE
TANKERS INC                                                        Alex Vardoulakis <alex@caribetankers.us>

## RE: OFFER TO BUY YOUR SHARES

1 message

**Eduardo Neri** <eneri@mapalogistics.com>                                    Tue, May 4, 2021 at 3:52 PM
To: Alex Vardoulakis <alex@caribetankers.us>
Cc: "Shoemaker, Douglas" <DShoemaker@blankrome.com>, Dimitris Georgantas
<Dimitri.Georgantas@roystonlaw.com>, Marina Liouta <m.liouta@lplawfirm.gr>, "Adkins, John A."
<jadkins@blankrome.com>

Alex,

You are once again changing the facts to accommodate your benefit.

The Promissory Note you signed to me personally had nothing to do with any transfer of CTL shares. You
have repeatedly confirmed the number of shares that you own in CTL, including through statements you
made to the court during your divorce. You never wanted to own more shares of CTL, as shown by your not
buying Sypros' shares when he sold them to CTL.

The $600,000 for the Promissory Note was given to me for the following:

•     $60,000 as a loan to Sea Adventure Maritime (your company) on November 8th, 2010. You
recognized this debt to Dimitri Georgantas in an email message you sent.

•     $40,000 I gave you in cash to support you during your divorce process at a time when you had
no money, and your Ex Wife did not allow you to take money from your accounts.

•     $500,000 as consideration for changing the Contracts of Affreightment from MAPA Logistics
USA, Inc. to CTL

About MAPA USA, you never owned any part of that company. We had an agreement to share any profit we
may have in MAPA USA and CTI. That agreement also included an obligation to make available the financial
information of both companies every year to check the results, which I did every year and you did not do for
CTI at all, thus again failing to perform agreement we had.

As to your false allegation that I triggered the Buy-Sell agreement with my "Confidential Settlement Proposal"
of April 23rd, 2021, please refer to the specific wording which states:

EXHIBIT F

**"This proposed settlement is offered in good faith and is not intended to be, nor should it be interpreted as, a written notice to exercise the buy-sell rights provided by that certain First Amended Buy-Sell Agreement dated as of December 14, 2015, by and between you and me as shareholders."**

To the extent your letter dated May 3rd, 2021 is an offer to purchase my shares, thereby triggering the Buy-Sell Agreement, it is rejected, and I will consider whether to exercise my right to buy your shares at the same price per share you have proposed.

You have been removed as an officer and director of CTL, and the CMA between CTL and CTI has been terminated. You must stop any action which interferes with the business of CTL and MAPA USA. I will proceed legally on all fronts against you if necessary and suggest you reconsider the Settlement Proposal. This will allow you to walk away and maintain some reputation in the market, but it is up to you entirely.

Sincerely

Eduardo Neri

MAPA Logistics

As Agents Only

**De:** Alex Vardoulakis <alex@caribetankers.us>
**Enviado el:** lunes, 3 de mayo de 2021 05:46 p. m.
**Para:** Eduardo Neri <eneri@mapalogistics.com>; Eduardo Neri <eduardo@caribetankers.us>
**CC:** Shoemaker, Douglas <DShoemaker@blankrome.com>; Dimitris Georgantas <Dimitri.Georgantas@roystonlaw.com>; Marina Liouta <m.liouta@lplawfirm.gr>; Adkins, John A. <jadkins@blankrome.com>
**Asunto:** OFFER TO BUY YOUR SHARES

Eduardo,

Please see attached my offer as related to the buy-sell agreement you triggered April 23rd.

Please respond as per the agreement reads.

Alexios Vardoulakis

Caribe Tankers Inc